# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

ARIENS COMPANY,

        Plaintiff,

    v.                                      Case No. 05-C-139

WEC COMPANY, D/B/A WOODS
EQUIPMENT COMPANY,

        Defendant.

## DECISION AND ORDER

In this diversity action for breach of contract, defendant Woods Equipment Company moves for partial summary judgment. Although both sides maintain that the other breached, Woods wants to know, before we reach the issue of breach, what the proper measure of damages would be in the event it is ultimately found liable. To that end, Woods posits that Ariens' damages are definitively and exclusively limited to the one remedy explicitly provided for in a Supply Agreement entered into between the parties. Ariens disagrees and suggests that all of the standard remedies for breach of contract are available to it for Woods' breach. For the reasons given below, the motion for partial summary judgment is denied.

## BACKGROUND

Ariens, of Brillion, Wisconsin, manufactured riding lawn mowers that Woods bought and resold under its own trade names. Because Woods, like most retailers, could not predict with certainty the demand for such lawn mowers (or at least it did not want to assume that risk), it entered into a sort of requirements contract with Ariens. By virtue of a Supply Agreement dated

June 8, 2000, Woods was to give Ariens rolling forecasts of the number of mowers it wanted. (Pltf. Br., Ex. 1.) By the middle of every month, the Supply Agreement contemplates, Woods was to submit its forecast for the next twelve months, with the first twelve weeks of that period forecast individually.[1] The agreement sets forth a sliding scale of risk and flexibility: depending on how distant Woods' forecast was, Woods could either be bound by the forecast (i.e., it could not adjust it) or it could alter it between 15% or 50% either way. For instance, Section 5.1(b)(ii) of the agreement indicates that "[i]n either or both weeks seven and eight of the Rolling Forecast schedule horizon, Woods may change its weekly forecasts . . . by an increase of up to fifteen percent (15%) or a decrease of up to twenty-five percent (25%)."

The parties had been doing business for several years, but by 2004 both sides wanted to end their arrangement. Ariens was looking to get out of the relationship via a change-in-control provision triggered when Woods was bought by outside investors. For its part, Woods was attempting to find another manufacturer (apparently the Jacobsen company) for its mowers. In the interim, however, Woods actually increased its forecasts, apparently as insurance against a disruption in supply when it ultimately switched to a new supplier. On May 28, 2004, Woods issued its final forecast, in which it requested 514 lawnmowers for August as well as 40 mowers for September. The same day, it emailed purchase orders for all of those mowers to Ariens. (Johns Decl., Ex. B-H.)

Subsequently, and apparently at the behest of new management, Woods began looking to "pull back some orders from Ariens." (Keane Decl., Ex. N.) On July 22, some two months after ordering over 500 mowers, Woods asked Ariens if it could reduce its August forecasts and cancel

---

[1]Forecasts were not actually provided regularly as set forth in the agreement.

2

its September forecast entirely. Ariens demurred, noting that it could not "reduce/cancel any orders for these products for August or September" because it was "committed on parts." (Johns Decl., Ex. M.) A week later, via email, Woods told Ariens not to produce any mowers for September or "any other month." (*Id.*) As a result of this cancellation, Ariens was left with roughly $1 million in inventory that was unique to the mowers it produced for Woods, some of which it was eventually able to sell. Ariens attempted to recover its losses, but Woods claimed it was not liable for them. The parties' attempts to settle their dispute foundered, and this lawsuit ensued.

## ANALYSIS

Presently before me is the narrow issue of what remedies, if any, are available to Ariens for the cancellation of Woods' orders. Woods contends that this issue is controlled by established principles of contract construction. Under the law of Illinois, which the parties agreed would govern (Pltf. Br., Ex. 1, § 13.1), parties to a contract "may contract for an exclusive remedy which shall be binding on them." *U.S. for Use & Benefit of Armco Drainage & Metal Products, Inc. v. Vander Heyden*, 158 F. Supp. 930, 932 (S.D. Ill. 1958); *see also Lake County Trust Co. v. Two Bar B, Inc.*, 537 N.E.2d 1015, 1019 (Ill App. 1989) ("Parties may contract for an exclusive remedy which shall be binding upon them."). Woods claims this is precisely what the parties did here. It argues that according to the plain meaning of its terms, the Supply Agreement contains the sole remedy for any breach Woods is alleged to have committed.

The Supply Agreement states that if Woods dropped its forecast for weeks seven and eight by more than 25%, or weeks nine through twelve by more than 50%, Ariens "may charge Woods an inventory carrying cost charge of twelve percent (12%) annualized, pro-rated for the number of weeks any component engines purchased by Ariens to fill the prior forecast remain as excess

3

inventory." (Pltf. Br., Ex. 1, § 5.1(b)(ii)-(iii).) In other words, if Ariens bought engines in reliance on Woods' forecasts for weeks seven or eight, and Woods later reduced its request by more than 25%, Ariens had the right to charge Woods interest (carrying costs) on those unused engines (minus 25%) until it was able to put them to other use. As applied here, Woods' reductions in forecasts to zero would mean Woods would be liable for either 50% or 75% of its earlier forecasts (the difference between the reduction allowed by the agreement–either 25% or 50%–and zero); and its liability would be limited further to Ariens' carrying costs on component engines.

Because the agreement explicitly provides for this situation, both parties agree that a cancelled forecast is not actually a breach of the agreement. Ariens explains that the carrying costs imposed under Section 5.1 were not a "remedy" for breach but were merely a "disincentive against Woods reducing production." (Pltf. Br. at 34.) That is, if Woods was on the hook for carrying costs, Ariens believed, Woods' forecasts would be more accurate and less rosy. Woods agrees that a cancelled forecast would not necessarily be a breach; in its view the agreement gave it the right to cancel forecasts more than six weeks out as long as it was willing to pay the carrying costs for the component engines.[2]

_____

[2]In Woods' opinion, this risk allocation makes perfect commercial sense. For its more immediate forecasts, Woods would be locked in and would presumably be fine with that because it would be in a good position to know with some concreteness what its immediate demands were. For its part, Ariens was given a level of certainty, which it probably required due to its production schedule. With respect to the more distant forecasts, Woods could submit "ballpark" estimates and, as long as those estimates were within the given percentage ranges, they could be changed without penalty. Ariens had essentially two options with respect to more extended forecasts (and perhaps all of the forecasts). One option would be to buy-in to Woods' extended forecasts and ramp up production accordingly, in which case it could possibly reap savings due to economies of scale or volume discounts in purchasing its components and parts. In that event, it would be assuming the risk that Woods' projections were significantly overstated (i.e., more than 25% or 50%), and that Woods would eventually renege on its requests. That would result in Ariens being covered for only some of its actual costs (carrying costs for engines) and of those costs only a portion (the amount

4

Case 1:05-cv-00139-WCG   Filed 02/01/06   Page 4 of 8   Document 101

Where the parties disagree is about the impact the carrying cost provision has on Ariens'

ability to obtain other damages. In Woods' view, Ariens' ability to charge carrying costs for engines

is its *sole* remedy for Woods' forecast reductions. Thus, to calculate Ariens' "damages," it is simply

a matter of determining when the "schedule horizon" began and identifying which forecasts Woods

cancelled, and when. Then, under Section 5.1(b), we would calculate Ariens' carrying costs of

component engines it bought in reliance on Woods' forecasts, and we would reduce those costs by

25% or 50%, depending on which week in the schedule horizon its cancelled forecast fell.[3]

At first glance, that result seems draconian because Ariens' losses are only partly covered

and it would be left (as here) with substantial amounts of unused or unusable parts. Moreover, the

result also fails to provide Ariens any expectation interest it might have had, i.e., its lost profits.

Although seemingly harsh, Woods' interpretation of the agreement is mostly correct, at least

inasmuch as it relates to *forecasts,* a distinction made clear below. Two reasons suggest themselves.

First, because both sides agree that forecast reductions do not even constitute a breach of the

agreement, it is hard to discern what other "damages" Ariens believes would be justified based on

a cancelled forecast. More importantly, however, the agreement also states explicitly that forecasts

are *not* purchase orders and are not binding. "Rolling Forecasts are provided hereunder for

convenience only and shall not be deemed binding purchase orders." (Pltf. Br., Ex. 1, § 5.1(a).)

---

of overestimation minus the allowed percentage). Ariens' other basic option would be to ignore the
extended forecasts and work only on the more immediate ones. In this event it might ultimately cost
more to produce each mower when the time came, but it would be ensured coverage of 100% of any
losses due to carrying the engine components.

[3]As noted, forecasts for the first six weeks are not changeable under the Supply Agreement.
The parties seem to agree that Woods would be liable for carrying costs on *all* of Ariens' component
parts–not just engines–but that result is unclear from the agreement itself.

Thus, because forecasts are not concrete offers to purchase, they do not obligate Woods to purchase *anything*; with a mere forecast in place, there is simply no contract to purchase and therefore no conceivable damages for breach. Without any breach in sight, Woods is correct that any recourse for changed forecasts must be found in the agreement itself rather than in the remedies the law provides for breach of contract.

Indeed, when one considers that the forecast scheme provided for in the agreement is merely an advisory one, Woods' interpretation of the agreement no longer seems so harsh. It would be an unusual business practice–remarkable, even–for a large, sophisticated corporation like Ariens to manufacture expensive custom-made goods for a customer without any binding commitment that the goods would ultimately be purchased. Such a system would leave the manufacturer exposed to substantial risk and would allow the purchaser almost unfettered flexibility in its orders. Certainly, Ariens *could* have assumed that level of risk, but if it did so it would be left with the very limited remedy provided in the agreement.

But that is not what happened here. So far I have concluded that Woods is correct to the extent that Section 5.1 provides Ariens' sole remedy for downward variations in *forecasts*. As noted earlier, however, Woods did not just make forecasts, it issued *purchase orders* for the products it wanted. Whereas the forecasts are merely advisory and for the parties' "convenience," purchase orders are not nearly so ephemeral; Woods itself described them as "firm" orders. (Keane Decl., Ex. J.) An order to purchase is an offer, which if accepted creates a separate contract and implicates all of the remedies provided by law, subject to the parties' own terms and conditions. *Echo, Inc. v. Whitson Co., Inc.*, 52 F.3d 702, 705 (7th Cir.1995). If Ariens is ultimately vindicated at the merits stage of this lawsuit, it will not be because it is attempting to enforce nonbinding

6

forecasts, but because, as a Woods vice-president claimed in August 2004, "[t]hese were legitimate

PO's given by Woods with a contractual obligation that was not adhered to." (Theucks Decl.,

Ex. G.)

The fact that actual contractual relations governed the purchase orders is underscored by the

fact that the May 28 purchase orders indicate that "the purchase order terms and conditions, revised

as of 4/1/01, are adopted and incorporated in this order." (Johns Decl., Ex. B-H.) Those terms and

conditions were signed by both sides as of March 2004. Although the specific remedies at issue are

not squarely before me in the present motion, the terms and conditions indicate that if Woods

canceled an order, it would have to pay for any orders Ariens had already completed; as to other

mowers in production, the parties were to enter negotiations about other damages Ariens suffered.

(Pltf. Br., Ex. 2.)

Thus, although Woods glosses over the distinction between forecasts and purchase orders,

it is a crucial one. It is not as though Ariens was relying on nonbinding forecasts when it produced

mowers for Woods–it relied on purchase orders which were governed by separate terms Woods

itself drafted.[4]  Although Woods may be correct that the Section 5.1 remedy is the exclusive remedy

for any losses Ariens sustains by relying on *forecasts,* the Supply Agreement says nothing about

what happens when a purchase order is cancelled. The existence of a binding contract to purchase

---

[4]Woods seems to recognize this problem when it subtly tries to equate "orders" and "forecasts." (Def. Br. at 5.) But that equation makes no practical sense; moreover, it is undermined by the Supply Agreement itself ("Rolling Forecasts . . . shall not be deemed binding purchase orders"), and it was not reflected in the parties' conduct–after all, why issue purchase orders if forecasts were all that was needed? " (Pltf. Br., Ex. 1, § 5.1(a)). Woods also makes an attempt to say that the purchase order terms cannot conflict with the Supply Agreement, which the Agreement might trump by virtue Section 13.2. But the Agreement itself states that forecasts are *not* purchase orders. As such, any terms regarding forecasts cannot logically conflict with terms regarding purchase orders; by definition, the two are wholly different.

creates rights that Ariens may enforce wholly apart from any remedies the agreement sets forth for alterations in forecasts.

## CONCLUSION

Given the existence of sources of contractual rights apart from Section 5.1 of the Supply Agreement, the remedy set forth therein is not the exclusive remedy available to Ariens. Accordingly, the motion for partial summary judgment is DENIED.

SO ORDERED this   1st   day of February, 2006.


s/ William C. Griesbach
William C. Griesbach
United States District Judge