# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

ARIENS COMPANY,

        Plaintiff,

    v.                           Case No. 05-C-139

WOODS EQUIPMENT COMPANY,

        Defendant.

---

## DECISION AND ORDER

---

The parties to this contract action are before the court again, this time on the plaintiff's motion for summary judgment. An earlier ruling denying the defendant's motion for partial summary judgment left several doors open, and Ariens seeks to close them with the instant motion. I conclude, however, that the existence of genuine issues of material fact precludes the entry of summary judgment both as to Ariens' claims and Woods' counterclaims. Accordingly, the motion will be denied. The parties have also filed motions to strike and/or exclude certain testimony. Ariens' motions will be granted in part and denied in part, the result being that the bulk of Woods' counterclaims are rendered severely crippled; Woods' motion will be denied.[1]

### I. Ariens' Contract Claim

Ariens first moves for summary judgment on its claim based on purchase orders Woods cancelled. Although Woods had the right to cancel the orders, if it chose to cancel it was

---

[1]Familiarity with the facts and agreements is presumed; they are discussed at some length in this court's February 1, 2006, decision and order. (Docket No. 101.)

responsible for compensating Ariens for any unrecoverable costs Ariens incurred in acting on the orders: "Buyer will pay Seller the order unit price for all items completed in compliance with the terms of this order and will pay Seller an amount to be negotiated by the parties for uncompleted work in process."[2] However, determining what was "uncompleted work" was subject to Woods' discretion: "Provided further, Buyer shall have no obligation to make any of the aforesaid payments to Seller, either for completed items or in connection with terminated work in process, unless Seller shall establish to Buyer's satisfaction that such completed items or the work in process, including materials, are unusable in connection with Seller's other work."

In light of this last clause, Woods argues that Ariens never established to Woods' "satisfaction" that the parts and materials were unusable in Ariens' other work. There was an ongoing negotiation, but no agreement, and negotiation is all that the contract required. Ariens responds that although the contract may merely have required negotiation, it did not allow Woods to simply dismiss Ariens' claims out of hand.

Although Ariens might ultimately be correct, I cannot conclude on the record before me that Woods was in violation of the relevant portion of the agreement. The agreement clearly gives Woods the authority to determine, to its own satisfaction, whether Ariens' products were unusable or not, and Ariens has not provided evidence that Woods ever did this. Ariens claims that Woods' argument goes only to damages rather than liability, but it actually goes to both: there will be no damages for those products which Ariens has failed to show were unusable in connection with its other work. That argument speaks to liability as much as it does to damages. Because Ariens has not demonstrated that there are no genuine issues of material fact as to whether it "establish[ed] to

---

[2]The purchase order terms are found at Docket 81, Ex. 2 at 5.

2

Buyer's satisfaction that such completed items or the work in process, including materials, are unusable in connection with Seller's other work," summary judgment must be denied on Ariens' contract claim.[3]

## II. Woods' Claim for Failure to Provide Upgrades and Improvements

The remainder of Ariens' summary judgment motion is directed at Woods' counterclaims. Woods' primary counterclaim alleges that Ariens breached a section of the supply agreement requiring it to make available to Woods any major design improvements or upgrades to the products produced under the agreement or "Ariens-comparable models." Section 6.4(a) of the Supply Agreement reads:

> As major design improvements or feature upgrades are identified with respect to products manufactured hereunder, Ariens will make these available to Woods at the same time that they are included in Ariens-comparable models. If Woods elects not to include the improvements or upgrades in the products it orders hereunder, Ariens will continue to supply Woods with such products, without such improvements or upgrades, at the prices originally agreed upon by the parties.[4]

### 1. Scope of § 6.4

In Ariens' view, the plain language of the agreement means that Woods was only entitled to improvements made to "products manufactured hereunder," that is, those mowers that are specifically listed in the agreement's schedules. The mowers manufactured under the agreement

---

[3]Even if there is some sort of requirement that Woods negotiate in good faith (which Ariens implies), this would not allow for summary judgment. Ariens believes all that remains is the question of damages, but that question is intertwined with the liability question – namely, how many completed items were actually "unusable" at the time Woods cancelled. Thus, even if Woods did breach this provision of the agreement by stonewalling, the record lacks sufficient evidence to determine whether Ariens' unusable materials actually were as Ariens now describes them.

[4] The supply agreement is found at Exhibit A to the Declaration of Michael Theucks (Docket No. 132). All references to the agreement herein are to that document.

3

were designated R2048, M2250, M2560 and R1540, and Ariens has not made any improvements to those models. Any design improvements Ariens did make, it argues, were to models not covered under the agreement. Under Woods' interpretation, Ariens argues, Woods would be entitled to any improvements made to Ariens' entire line of mowers, an entitlement not contemplated by the parties when the agreement was signed.

Woods argues that the clause is not limited to those models specifically listed in the agreement because "Ariens-comparable models" are also covered under § 6.4(a), which reads: "[a]s major design improvements or feature upgrades are identified with respect to products manufactured hereunder, Ariens will make these available to Woods *at the same time that they are included in Ariens-comparable models.*" This means, in Woods' view, that any time Ariens makes major improvements to models that are *comparable* to those produced under the agreement, it must also make those improvements available to Woods. Read in this way, Ariens' upgrade obligation turns on the similarity of the model upgraded to the models listed in the agreement rather than Ariens' say-so of what constitutes a model; otherwise, Ariens could simply change a model number or make some other cosmetic change and claim the mower is a "new" model, thereby depriving Woods of the new technology. Following up on this interpretation, Woods argues that major improvements were made to the PM260Z model. Compared side-by-side with the models Woods was purchasing from Ariens under the agreement, it argues, there is essentially no difference. As such, Ariens was required to make available to Woods the improvements it made to the PM260Z models.

On the record as it now stands, I construe the supply agreement as requiring Ariens to make available to Woods any improvements it made to the models covered by the agreement, as well as to "comparable" models Ariens manufactured under other names or model numbers. The agreement

4

makes no sense otherwise.[5]  Ariens goes to great lengths to demonstrate that Woods knew it was not entitled to *all* of Ariens' product upgrades, but no one is arguing that it is.  Instead, Woods is merely saying that it was entitled to upgrades to those models Ariens produced that were the comparables of the ones specifically produced under the agreement.  This interpretation seems to fit the language of the agreement.  First, the obligation arises as major design improvements or feature upgrades are "identified" with respect to the models produced under the agreement, which suggests that the obligation is triggered not when concrete improvements are actually made to the specific mowers provided under the agreement but when those ideas could *potentially* be implemented on those models.  Thus, Ariens' argument that no improvements were *made* to the relevant mowers is off the mark.  Second, this language dovetails with the second part of § 6.4(a), which states that "Ariens will make these [upgrades] available to Woods at the same time that they are included in Ariens-comparable models."  This language suggests that the time for Ariens to make the improvements or upgrades "available to Woods" is when they are "included on Ariens-comparable models."  Because inclusion of the upgrades on Ariens-comparable models is the point of reference that triggers Ariens' obligation to make them available to Woods, Ariens cannot persuasively argue that the supply agreement's silence about the "PM260Z" model–or any other potentially comparable models–is fatal to Woods' claim.  The question is whether Ariens made upgrades to models comparable to the ones it provided Woods under the agreement, and that is an issue for trial rather than summary judgment.

_____

    [5]I do not find this provision of the contract free from ambiguity, however.  Extrinsic evidence, such as the parties' negotiating history and their performance under the contract, may result in a different construction at trial.  The evidence relating to these matters is disputed, and I therefore have not relied upon it in deciding the present motion.

**2 The Parties' Failure to Agree on Price**

Ariens further argues that even if I construe the contract as I have above, Woods cannot make out a claim for breach because the parties never agreed on the price Woods would pay for the upgrades, as required by § 6.4(b). That section reads:

> The cost of major improvements or feature upgrades that Woods elects to include in the products it orders hereunder will be factored into the price that Ariens charges Woods for such products. When the decision is made to make the improvements or upgrades, the development and tooling costs for such improvements or upgrades will be added to the price of the applicable products manufactured hereunder, on a per unit basis, and these costs will be amortized over a number of units. The parties will agree upon the number of units to be used for amortization purposes at the time the decision is made to make the improvement or upgrade.

This section reasonably requires that if Woods wants to take advantage of any upgrades, it must share in the cost Ariens invested in their development. According to Ariens, however, the parties failed to reach any agreement on what the development and tooling costs would be; in fact, Woods never even offered to "pay a dime" for the upgrades. Thus, Woods cannot claim that Ariens somehow breached the provision of the contract requiring it to provide Woods with upgrades.[6]

Even so, however, the counterclaim for breach is that Ariens never *offered* Woods the various upgrades to which Woods now claims it was entitled. Under section 6.4(a), Ariens was to "make these [upgrades] available" to Woods, and Woods' claim for breach on this basis is separate from any issues involved in unresolved negotiations over tooling costs for other products. That is,

---

[6]The fact that the price and quantity of such improved or upgraded machines was left open for future agreement may render this provision of the contract so indefinite as to be unenforceable. *See Academy Chicago Publishers v. Cheever,* 578 N.E.2d 981, 984 (Ill. 1991) ("[I]f the essential terms are so uncertain that there is no basis for deciding whether the agreement has been kept or broken, there is no contract."). Although Ariens suggests that this principle may be applicable here (Br. In Supp. of Mot. for S.J. at 35), it does not sufficiently develop the argument to warrant summary judgment. As will be seen later, the uncertainty of this provision also creates difficulties for Woods in its effort to establish damages.

the negotiations over tooling costs are only to occur under § 6.4(b) once Ariens has notified Woods

about what potential upgrades are available. Thus, Ariens' complaint that Woods never paid a dime

for the upgrades jumps the gun.

**3. Notice**

Ariens also argues that Woods' claims for breach cannot succeed in the face of its failure

to provide the notice required under the agreement. Section 2.2(b) of the Supply Agreement,

entitled "Termination for Breach," provides:

> If either party materially breaches this Agreement, the nonbreaching party shall
> notify the other party of such breach in writing. If the breaching party fails to cure
> the breach within thirty (30) days after receipt of such written notice, the
> non-breaching party may terminate this Agreement immediately upon notice to the
> breaching party. [Upon any breach of this Agreement, the nonbreaching party shall
> be entitled to all available remedies under this Agreement, a [sic] law or equity,
> including without limitation the termination of this Agreement pursuant to this
> Section 2.2 and the recovery of damages.]

Ariens asserts that Woods has sat on its hands for years, allowing the alleged breaches to pile

up and go unnoticed, only to assert a claim for millions of dollars in damages that could have been

averted long ago. Ariens portrays the failure to give notice as both a legal bar to Woods' claims as

well as evidence that Woods never believed Ariens was in breach in the first place.

Woods disputes this characterization of the agreement's notice provisions, arguing that

notice and an opportunity to cure is only required for the nonbreaching party to *terminate* the

agreement. That is, lack of notice does not preclude the nonbreaching party from recovering

damages for the breaches; it just means the nonbreaching party may not terminate the agreement.

Woods' interpretation is correct. First, while the notice and opportunity to cure are common

prerequisites to the premature termination of an agreement (usually a drastic remedy), Ariens has

7

not cited any precedent for the conditioning of a party's right to damages to the providing of notice. *See, e.g., Rattigan v. Commodore Intern. Ltd.,* 1989 WL 151678, *4 (S.D.N.Y. 1989) ("The conditions precedent that defendant allegedly has failed to satisfy--notice, a hearing and opportunity to cure--relate only to the termination provision of the contract, and do not affect damage actions brought under the contract as a whole. Defendant is not suing for termination; rather, it sues for damages allegedly caused by plaintiff's breach of duties under the contract.")

Second, the plain language of the agreement–in particular, the bracketed portion of § 2.2(b)–makes clear that notice is required only prior to termination: "Upon *any* breach of this Agreement, the nonbreaching party shall be entitled to all available remedies under this Agreement, a [sic] law or equity, including without limitation the termination of this Agreement pursuant to this Section 2.2 and the recovery of damages." The title of the section, moreover, is "Termination for Breach." Thus, the plain language of the agreement demonstrates that notice is not a prerequisite for receiving damages for breach.

### III. Woods' Residential Mid-mount Claim

In addition to seeking lost profits based on upgrades Ariens never provided to Woods under § 6.4(a), Woods also claims damages of some $335,000 following Ariens' decision to stop supplying the R2048 model. Ariens seeks summary judgment on this claim on the basis that this dispute was settled by accord and satisfaction in 2003 when Ariens agreed to lower the volume discount to Woods' advantage. The original threshold for a volume discount had been 1,100 units, but Ariens lowered this threshold to 850 units and thereby allowed Woods to get a 1% discount. Ariens paints this as a full settlement of any claims Woods might have had related to the R2048. Woods, of course, disputes this characterization. It claims Ariens' decision to curtail R2048

8

production caused it significant damage. Although Ariens' lowering of the volume discount level took some of the edge off of Woods' losses, Woods argues that the agreement to lower that level was not an accord and satisfaction of the parties' dispute.

Under Illinois law, which the parties agree applies, accord and satisfaction requires: (1) a bona fide dispute as to the claims pending between the parties; (2) an unliquidated sum owed; (3) consideration; (4) a shared mutual intent to compromise the claim; and (5) execution of the agreement. *MKL Pre-Press Elecs./MKL Computer Media Supplies, Inc. v. La Crosse Litho Supply, L.L.C.,* 840 N.E.2d 687, 691 (Ill. App. Ct. 2005). Here, the parties dispute that in 2003 they shared a mutual intent to compromise the claim. Ariens has described the agreement to reduce the volume discount threshold, which resulted in a payment to Woods of some $43,726.64. (PFOF ¶ 101.) But nowhere does Ariens demonstrate conclusively that this agreement was meant as a satisfaction of the dispute relating to R2048 mowers. Thus, the dispute is a genuine one because Ariens has not provided conclusive evidence that the agreement to lower the volume discount threshold was intended as a complete settlement of all disputes relating to the R2048 mowers.[7]

**IV. Ariens' Motions to Exclude Testimony and / or Strike**

**1. Lost Profits / Lost Sales of Commercial and Residential Mid-Mount Mowers and Parts**

Ariens has filed a motion to strike the testimony and expert reports of Professor John Nevin, of the University of Wisconsin. It has also filed a motion to strike the declaration and opinions of Robert Buzzard, a product manager at Woods. Ariens' principal argument in both motions relates

---

[7]Finally, Ariens seeks summary judgment on "all other claims" Woods has brought. It seems to have abandoned this vague argument in its reply brief, however. As noted below, Woods still has claims arising out of warranty work and Ariens' failure to deliver 70 mowers that Woods had ordered.

to the inadequacy of Woods' method of proving the causation of lost profit damages. Because Nevin's lost profits evidence is based on assumptions provided by Buzzard, Ariens' arguments concerning Buzzard and Nevin are largely intertwined. Accordingly, I address both witnesses together.

The first order of business is to determine which of Nevin's expert reports to consider. In response to Ariens' motion, Woods filed a "supplemental" report which contains (in some cases) substantial changes and new data. Ariens protests that Woods' expert reports should not be a moving target and argues that I must consider only the expert report originally filed. (To that effect, it has filed a motion to strike the supplemental report.) Ariens is certainly correct that in its original motion it cannot have been expected to develop arguments addressing a report not yet even filed, but that is an issue more of practicality and fairness (both salient concerns, to be sure) rather than an evidentiary matter. I conclude here that the interests of justice are advanced more by consideration of potentially relevant evidence, which was provided months prior to trial and only three days after the close of discovery, rather than by holding Woods to its initial report and striking the supplement. The Federal Rules impose a duty to supplement, *see* Fed. R. Civ. P. 26(e), and in this case striking the supplemental report would serve only to punish Woods for providing *more* information. In any event, as discussed below, the bulk of the expert's testimony will be precluded.

Recall that the lost profits at issue are those stemming from Woods' inability to sell mowers with the design upgrades it alleges Ariens withheld from it. In other words, had Ariens lived up to its obligations under § 6.4 of the supply agreement and provided Woods with the upgrades Ariens made to "Ariens-comparable mowers," Woods' sales and profits would have been much higher. In addition, Woods alleges that Ariens wrongfully stopped providing residential mid-mount mowers

10

(R2048) and that it lost out on substantial sales of these mowers in 2003-2005. According to Nevin, Woods lost $1.7 million in profits on commercial mid-mount Mow'n Machines and $335,000 on the residential mid-mount units that Ariens stopped providing. (Nevin Decl., Ex. A. at 6-7.) Woods' loss of these sales also meant it lost out on the sales of parts for the mowers it would have sold. Nevin predicts, based on a ratio of past sales to parts profits, that Woods lost out on $683,000 for commercial mid-mount parts and $69,000 for residential parts. (*Id.* at 8.) These figures constitute the lion's share of the $3.2 million Woods alleges in total damages. (*Id.* at 11.)

Ariens describes Woods' efforts to show lost profits as a "shell game," and the description is somewhat apt. Following Ariens' motion to strike Nevin's report and testimony, Woods filed (in addition to the supplemental report) the declaration of Robert Buzzard in an apparent attempt to bolster the weaknesses Ariens identified in Nevin's original report. Buzzard's testimony will not salvage Nevin's report, however, because he provides no admissible basis for his projections of future sales. In short, Woods simply assumes a certain level of sales were lost as a result of Ariens' breach without providing any competent evidence supporting its projections. Because lost sales constitute the foundation of future lost profits, and because Woods has not adequately laid this foundation, its damages claims for lost profits are hopelessly speculative.[8]

_____

[8]The problem is further compounded by the fact that we have no idea what Woods' cost for the improved or upgraded mowers would have been. As noted above, if Woods elected to include improvements or upgrades on the products it ordered, the costs of the improvements, including development and tooling costs, were to be added to the price Woods was required to pay on a per unit basis amortized over the number of units purchased. But since the parties never reached any agreement on the improvement costs or number of units Woods would order, the price per unit is unknown. Without this information, it is difficult to see how one could arrive at a reasonable projection of sales or reach any conclusion about lost profits.

11

The expert, Professor Nevin, concedes that he has not attempted to project what Woods' sales figures would have been had Woods received the pertinent design upgrades from Ariens. According to his supplemental expert report, he states:

> For purposes of my damage analysis, I will assume that Ariens has breached the Supply Agreement and that Woods sustained economic damages that are the direct and proximate result of Ariens' breaches. *I am relying upon Woods' management representations that the drop off in Mow'n Machine sales was caused by not having current models.*

(Nevin Decl., Ex. A at 4.) As to the commercial mid-mounts, Nevin states that his calculation is based on "the assumption that Woods could have maintained its 2001 and 2002 average market share of 1.25 percent but for Ariens' refusal to provide the redesigned commercial mid-mount machines." (*Id.* at 6.) Similarly, with respect to the residential R2048 units, Nevin "assumes that Woods would have continued to sell 248 units per year, its average of 2001 and 2002." (*Id.* at 7.)

Of course what Nevin assumes is the *crucial* matter of the moment. The starting point for any lost future profits analysis is the projection of future sales. That is, to even reach the question of future profits Woods needs to establish evidence of future sales, which is another way of saying Woods needs to establish, or at least have evidence, that the alleged breach *caused* Woods to lose a certain number of sales it otherwise would have enjoyed. Thus, it is clear that the expert testimony – by the expert's own admission – does not speak to that critical issue.

Because Woods has no expert opinion supporting these sales projections, which Woods concedes, the question is whether Robert Buzzard, `a lay witness, may provide the sales projections that underlie Nevin's calculations. (For example, Nevin notes that "Robert Buzzard stated that he had no doubt that Woods would have maintained its 2001 and 2002 market share if it had access to the design improvements and feature upgrades denied by Ariens." (Nevin Decl., Ex. A at 6-7.))

12

In other words, can a corporate executive testify to lost profits – as a lay witness – when those profits are based not on existing data but on projections of future sales? The answer, I conclude, is no.

A corporate manager may testify to facts of which he has personal knowledge and numerous others within his expertise. Fed. R. Evid. 701. For example, a non-expert company employee can testify that the defendant's breach caused concrete losses due to repair costs, defects, expenses incurred, or any other sort of damages founded in existing data or within the employee's personal knowledge. In this case, for instance, Buzzard may be competent to testify about warranty claims the company believes should have been paid by Ariens. But lost future profits are different. Buzzard wishes to testify not about facts within his personal knowledge, but about *counter*factual projections that Woods' sales *would have been* higher *if* they had been able to sell the mowers they allege Ariens should have supplied them. These are economic projections, and such projections require inferences. Inferences must be supported by more than the "say-so" of the company, but say-so is all we have in this case. *Zenith Electronics Corp. v. WH-TV Broadcasting Corp.,* 395 F.3d 416, 420 (7th Cir. 2005).

In *Zenith,* like here, the defendant filed counterclaims alleging that the nature of the plaintiff's products caused it to lose future business. As the *Zenith* court explained:

> Rule 701, which allows managers to offer the facts underlying such projections without the need to qualify as an expert, does not assist WH-TV, because its claimed losses depend on the inferences to be drawn from the raw data, rather than these data (or their internal appreciation) themselves. Reliable inferences depend on more than say-so, whether the person doing the saying is a corporate manager or a putative expert.

*Id.* (citations omitted).

Such concerns are particularly salient here given the doubly speculative nature of most of Woods' projections. Its projection (made without any expert aid or evidence) is not just that its sales would have maintained 2001-2002 levels, but also that those numbers would have been achieved through the introduction of a *new* product (i.e., the upgraded mowers Woods alleges Ariens withheld). This is exactly the sort of position that requires expert testimony to flesh out. What was the nature of the mower market at the time? How receptive were customers to the various upgrades that Ariens withheld? Are there any other explanations for Woods' downtrend? What was the nature of its sales and advertising compared to the competition? What would Woods' per unit cost be for the improved or upgraded mowers? At what price would Woods have been able to offer the improved or upgraded units? We do not know. Instead, all we have is Woods' belief that Ariens' success during the relevant period establishes that its upgrades caused the loss of Woods' market share. Nevin blithely notes that "obviously Ariens expanded its mid-mount market share over this same time period," and Buzzard's assumption is similar:

> the real question is what caused the [sales] decline in 2003, especially in the face of a rising market. The obvious fact that was different in that year was that Woods was faced with selling a product that was obsolete, or becoming obsolete, because Ariens refused to provide Woods with any of the design improvements or feature upgrades that it was making to its own comparable units.

(Buzzard Decl., ¶ 9.) He continues by firmly stating that he has "no doubt that Woods would have maintained its market share that it had in 2001 and 2002 if it had received access to the design improvements and feature upgrades denied by Ariens." Thus, it is evident that Buzzard's opinion is supported only by *post hoc* reasoning rather than any evidence. Woods has simply assumed that since Ariens' sales expanded, the only reason for that expansion was the withheld design upgrades.

14

Buzzard's opinion thus masterfully combines *ipse dixit* with the fallacy of *post hoc ergo propter hoc*. In short, his opinion as to Woods' future sales is without foundation and will not be allowed.

The question is closer with respect to the residential mid-mount claims. Buzzard's assumption there is that "[i]f Ariens had continued to manufacture and supply Woods with the R2048, then Woods would have been able to continue to make sales equivalent to the sales that Woods made in 2001 and 2002." (Buzzard Decl. ¶ 18.) Woods sold 276 of these mowers in 2001 and 231 in 2002 (a 16% drop), but after Ariens stopped supplying them Woods' sales dropped to 80 in 2003 and only one in 2004. Although Buzzard's assumption is plagued with the same lack of foundation as his assumption about the commercial mid-mounts, the question is closer because Woods actually had a track record of selling the 2048. That is, the 2048 was not a new model having unspecified design upgrades but an existing model that Woods claims Ariens wrongfully discontinued supplying. Nevertheless, Buzzard's sanguine opinion that sales would have stayed the same is not supported by anything other than his own claim that he has "no doubt" that sales would have continued at the 2001-2002 pace. He does not state a plausible basis for relying only on data for the two-year period of 2001-2002, nor does he account for the declining trend in sales that appears to have begun earlier. In other words, there is no basis to conclude that an average of 2001-2002 sales would provide a reasonable assumption about how many R2048 mowers Woods would have sold in 2003-2004. Thus, such testimony would not be based on Buzzard's "rational perception" of the facts, and accordingly such projections cannot constitute the basis of Nevin's lost profits conclusions. Fed. R. Evid. 701.[9]

---

[9] *See, e.g., KW Plastics v. U.S. Can Co.,* 131 F. Supp.2d 1265, 1274 (M. D. Ala. 2001) (excluding lay witness testimony on lost profits: "while Campbell may have sufficient personal knowledge based upon his own experience in the industry to provide some type of economic

15

Ariens further objects to Nevin's projection of losses based on lost parts sales, that is, those additional parts Woods would have sold had it also sold the mowers described above. Woods argues that Ariens has got its data wrong and also notes that Nevin made substantial changes to his calculations in his supplemental report. Ariens maintains that even with the changes to Nevin's report, Nevin has failed to provide an adequate foundation for his conclusions. In short, Nevin calculated that Woods' parts sales constituted 9.81% of its total sales of Mow'n Machines for the three prior years (substantially lower than his initial estimate), and he used this ratio to project the parts sales Woods missed out on because of Ariens' breach. He then accounts for Woods' profits on those lost sales and arrives at a figure of $773,191. Nevin's analysis is a fairly simple calculation based on historical correlations, and on its own it might withstand *Daubert* scrutiny. But it is subject to the same flaw noted above, namely, Buzzard's assumptions about Woods' sales. Because there is no foundation for the assumption that Woods' sales in 2003-2005 would be the same as they were in 2001-2002, there is similarly no basis to conclude that the parts sales corresponding to those mower sales would be as Nevin concludes.[10]

## 2. Ariens' Other Objections to Nevin's and Buzzard's Testimony

Although the lost profits issue consumes the bulk of Ariens' efforts, it also raises other issues with respect to Nevin's reports and Buzzard's declaration. Again, because the two largely rise and fall together, they are considered together.

_____

testimony and data, it does not necessarily follow that he has personal knowledge sufficient to project lost profits for six years into the future on the basis of the loss of customers that KW never had.")

[10]Nevin's analysis of the outdoor power equipment( "OPE") market also rests on Buzzard's unfounded assumptions.

Above I have accepted Ariens' principal argument that Nevin has no sound basis for adopting the future sales assumptions provided by Buzzard; this knocks out damages for most of the counterclaims, i.e., those dependent on the assumptions about Woods' future sales of Ariens-provided mowers. In addition, however, there remain claims based on unpaid warranty work as well as the 70 front-mount mowers that Woods claims it was owed under the agreement.

As to the warranty claims, Ariens protests the sampling technique Nevin used for showing warranty damages. Although one facet of Ariens' challenge has apparently been solved by the supplemental report, Ariens still challenges Nevin's method of sampling. The underlying claim seeks damages for what Woods alleges were Ariens' shortfalls in paying valid warranty claims it owed Woods. Because there are roughly 10,000 potential warranty claims at issue, Nevin selected 10% of them to comprise a sample. The claims were arranged by dollar amount and Nevin selected every tenth claim for analysis, beginning at a random point. Ariens' objection is that arranging the claims by value and selecting every tenth claim does not produce a representative sample. Ariens cites a manual published by the Federal Judicial Center which suggests that the starting point should be randomly selected and the samples chosen from a group not arranged in any particular order. *Reference Manual on Scientific Evidence* (2d Ed. 2002) at 100 n.52. I agree with Ariens that Nevin's method does not produce a perfectly random sample because the data were arranged by dollar value. Yet while it is possible to imagine data sets in which this arrangement would make a difference, Ariens does not explain how Nevin's approach would bias the result when we are dealing with more than 10,000 warranty claims. His approach ensures that every tenth claim (in dollar value) is counted, and so spreads out the sample across the scope of such claims. The same goes for Ariens' objection to Nevin's selection of 10% of the claims as a sample. Ariens has not

17

provided any compelling reason to conclude that 10% (i.e., roughly 1000 claims) is an insufficient sample. Assuming that a sampling technique is appropriate in the first place, an issue which neither party addresses, Woods' procedure does not seem unreasonable.

It seems instead that the potential flaw in Nevin's approach is that, like his lost profits opinions, it is based solely on Woods' say-so of what claims are "owed" by Ariens. That is, Woods examined the selected claims and simply determined what it believed Ariens owed, and Nevin based his damages calculations on those amounts. But while I found the lost sales assumptions to be wholly speculative, the assumptions at issue here relate to existing warranty claims that are conceivably within the personal knowledge of Buzzard and/or other Woods officials. They do not rely on projections or market analysis. Thus, this is not so much a *Daubert* issue as it is a matter that Woods will have to prove. If Woods can prove that Ariens failed to pay what Woods was entitled to under the contract for warranty claims, Woods may be able to recover, at least on those claims as to which such a showing is made, and possibly others if a sufficient foundation is established for using a sampling technique. Ariens' present challenge is to the kind of sampling technique Nevin used. Since it does not appear, at least at this point, that the manner of sampling utilized renders Nevin's opinion improper, Ariens' motion to exclude this portion of Nevin's testimony will be denied.

Woods' other claim seeks damages for the profits it lost when Ariens cancelled delivery of 70 front-mount machines. Ariens' objection to Nevin's damages calculation is that it assumes Woods would have been able to sell the 70 mowers at the "best dealer price" – an assumption provided once again by Buzzard. In contrast to the lost future profits issue addressed earlier, however, Ariens does not contest the fact that Woods would have been able to sell the 70 mowers

18

at issue here. Instead, the only remaining question is what price Woods would have received for them. Because we are not dealing with projections about future sales, but merely a question of the price Woods would have gotten for a pre-existing order of mowers, I conclude that Nevin is entitled to rely on the assumptions provided by Buzzard. Buzzard's assumption deals with a concrete order for existing mowers and the company's ability to sell those mowers in a distinct period of time. Ariens may attack Buzzard's assumptions about the price Woods would have received, but the existence of a factual dispute on that score does not provide grounds for striking Buzzard's declaration or excluding the expert's report on *Daubert* grounds.

Finally, Ariens also raises issues particular only to Buzzard's declaration. It claims Buzzard is making improper legal conclusions and contradicting other parts of the record. I first note that I have not relied on Buzzard's declaration in deciding the motion for summary judgment, except inasmuch as it might generally support the argument that several issues of fact remain outstanding. In any event, I conclude that Ariens' concerns do not warrant further relief at this time. To the extent Ariens cites inconsistencies in Buzzard's testimony, these may be fair game for cross-examination but not for striking declaration testimony prior to trial. Further, Buzzard himself concedes he is not qualified to make legal conclusions, and Ariens may raise any objections on that score if the issue arises at trial.

## V. Woods' Motion to Strike

Woods has filed what it describes as a "conditional" motion *in limine* seeking to prevent Ariens from offering testimony on the question of whether the inventory and parts for which Woods

cancelled its orders was usable by Ariens.[11]  Woods asserts that Ariens has taken the position that

such testimony would require an expert opinion.  Ariens did not file an expert report on the subject,

and so (in Woods' view) it should be precluded from offering any testimony on that score.  Woods

states that the motion is "conditional" because it relies on this court's adoption of Ariens' view–with

which Woods disagrees–that the issue in question requires expert testimony.  Woods also seeks to

strike certain portions of the declarations of Michael Theucks and Mary Johns, as well as affidavits

of Mark Leitner.  But again the motion is only conditional upon this court's delving into the factual

record and its striking certain testimony of Robert Buzzard, a proposition to which Woods objects.

Except for the question of whether expert testimony is needed to establish that Ariens' work

in progress when Woods cancelled its orders was otherwise usable, it appears that none of the issues

raised by Woods' motion to strike would affect my decision on the motions before me.  The

testimony targeted by Woods was not relied upon for any adverse ruling.  Even the issue of whether

expert testimony on the usability question is necessary need not be decided at this point, since I have

already denied Ariens motion for partial summary judgment on its claim against Woods and Woods

has not sought summary judgment in its own right.  To the extent the motion remains viable,

however, it will be denied.

In a nutshell, Woods' position is that: (1) Ariens' motions to strike and exclude should be

denied, but (2) if they are granted then Woods' motion should be granted as well.  This court has

never before received a motion filed by a party who explicitly disagrees with the very legal

---

[11]Recall that the purchase order terms read as follows: "Buyer shall have no obligation to make any of the aforesaid payments to Seller, either for completed items or in connection with terminated work in process, unless Seller shall establish to Buyer's satisfaction that such completed items or the work in process, including materials, are unusable in connection with Seller's other work."  (Docket 81, Ex. 2 at 5.)

principles it advances in the motion. (Ariens suggests Woods' motion is retaliatory.) In any event, Woods argument only makes sense if the two questions are essentially the same; they are not. Woods is comparing apples and oranges. I excluded Buzzard's and Nevin's testimony on the basis that there was no competent evidence of future sales of mowers. That is a different question from the matter at issue in Woods' motion. The record is not sufficiently clear for me to determine whether expert testimony is required for Ariens to prove the work in progress was not otherwise usable. That issue, like many others that remain, must await trial.

## VI. Conclusion

Ariens' motion for summary judgment is denied; its motions to exclude the report and supplemental report of John Nevin are granted in part and denied in part, such that Woods will be precluded from offering evidence as to its lost profits for mid-mount mowers and parts, as addressed herein. Ariens' motion to strike the declaration of Robert Buzzard is denied, but Buzzard will not be allowed to testify as to Woods' future sales of mid-mount mowers. Woods' motion to strike is denied.

**SO ORDERED** this ___9th___ day of September, 2006.

s/ William C. Griesbach
William C. Griesbach
United States District Judge

21